# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MICHAEL SPEASE,
      *Plaintiff,*

    v.

ANDREW SAUL, *Commissioner of Social Security,*
      *Defendant.*

No. 3:19-cv-1199 (JAM)

## RULING ON CROSS MOTIONS TO REVERSE AND AFFIRM DECISION OF THE COMMISSIONER OF SOCIAL SECURITY

Plaintiff Michael Spease has suffered from severe back pain after he was injured while working as a Master Captain in 2011. Spease has brought this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security, who denied his claim for disability insurance benefits under Title II of the Social Security Act. Spease has filed a motion to reverse the decision of the Commissioner or, in the alternative, to remand, Doc. #13, and the Commissioner has filed a motion to affirm the decision, Doc. #14.[1] Although I find no merit to most of Spease's arguments, I will remand this action for reconsideration in light of the failure of the Administrative Law Judge ("ALJ") to apply the Social Security Administration's "borderline age" rule. *See* 20 C.F.R. § 404.1563(b).

### BACKGROUND

I refer to the transcripts provided by the Commissioner. *See* Doc. #11-1; Doc. #18-1. Spease suffers from severe back pain brought on by a workplace injury when he was a Master

---

[1] Pursuant to Fed. R. Civ. P. 25(d), the Clerk of Court shall substitute the Commissioner of Social Security Andrew M. Saul as the defendant in place of Acting Commissioner Nancy A. Berryhill who was initially named as the defendant.

Captain for Coastline Service. *See* Doc. #11-1 at 441.[2] The Master Captain job was physically demanding, requiring Spease to lift anywhere from 50 to 125 pounds every day. *Id*. at 599. In April 2011, Spease was loading a boat when he was struck against the ship's rail by a 1,000-pound pallet that was being moved by a crane, and he felt several pops in his back and immediate pain. *Id*. at 441. A few months later, Spease lifted a bench at work and re-injured his back. *Ibid*. But he kept working as a Master Captain until November 2011, at which point he stopped due to his lower back injuries. *Id*. at 584. The movement of the boat caused him excruciating pain, and Spease's doctor told him that continuing to work on a boat would cause damage to the nerves. *Id*. at 46. Since November 2011, Spease has undergone three lumbar spine surgeries, most recently in May 2013. *Id*. at 568. Spease received workmen's compensation in connection with his injuries from November 2011 to July 2014. *Id*. at 45.

On the basis of his back problems, Spease pursued an application for disability benefits, a process that has now stretched on for approximately seven years. The first phase spanned for five years from January 2013, which was when Spease first filed an application for benefits, to January 2018, when Judge Thompson issued a consent order of remand for the Commissioner to reconsider the ALJ's denial of benefits. *See Spease v. Berryhill*, 17cv1021-AWT (D. Conn.).

On remand another hearing was held on January 30, 2019, at which Spease and a vocational expert testified. Doc. #11-1 at 580-608 (hearing transcript). After the hearing, the ALJ issued a second decision, concluding once again that Spease was not disabled. *See id*. at 561-79. Spease filed this action on August 5, 2019, again challenging the ALJ's decision that that he is not disabled. Doc. #1. He and the Commissioner filed cross-motions to reverse and affirm the decision of the Commissioner. Docs. #13; #14.

---

[2] Page references are to the pagination generated on the Court's CM/ECF docket.

To qualify as disabled, a claimant must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," and "the impairment must be 'of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (quoting 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A)). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [claimant] live[s] or in several other regions of the country," and "when there is a significant number of jobs (in one or more occupations) having requirements which [claimant] [is] able to meet with his physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(a)-(b); *see also Kennedy v. Astrue*, 343 F. App'x 719, 722 (2d Cir. 2009).

The agency engages in the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or his past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019); 20 C.F.R. § 404.1520(a)(4).

In applying this framework, if an ALJ finds a claimant to be disabled or not disabled at a particular step, the ALJ may make a decision without proceeding to the next step. *See* 20 C.F.R.

3

§ 404.1520(a)(4). The claimant bears the burden of proving the case at Steps One through Four; the burden shifts at Step Five to the Commissioner to demonstrate that there is other work that the claimant can perform. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

After proceeding through all five steps, the ALJ concluded that Spease was not disabled within the meaning of the Social Security Act. *See* Doc. #11-1 at 561-79. At Step One, the ALJ concluded Spease had not engaged in substantial gainful activity during the period from November 6, 2011, the claimed onset date of his injury, through December 31, 2015, the date of last insured. *Id.* at 567.

At Step Two, the ALJ found that Spease suffered from the following severe impairment: "Degenerative Disc Disease of the Lumbar Spine, status post surgeries[.]" *Ibid*. The ALJ concluded that this "medically determinable impairment[] significantly limit[ed] the ability to perform basic work activities as required by SSR 85-28." *Ibid*.

At Step Three, the ALJ determined that Spease did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Ibid*.

Moving to Step Four, the ALJ then found that Spease had the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally bend, balance, twist, squat, kneel, crawl, climb, but no climbing of ladders, ropes, or scaffolds. He must avoid hazards, such as heights, vibration, and dangerous machinery. Driving is okay. He needs an environment free from concentrated cold and heat. He requires a cane for ambulation only.

*Ibid*. At Step Four, the ALJ concluded that Spease had no past relevant work that he was capable of performing. *Id.* at 570.

At Step Five, after considering Spease's age, education, work experience, and RFC, the ALJ concluded that there were jobs that Spease could perform that existed in significant numbers in the national economy. *Id*. at 570-71. In reaching this conclusion, the ALJ relied on the testimony of the vocational expert. *Id.* at 571-72. Noting that Spease did not have the RFC to perform all or substantially all of the requirements of sedentary work due to "additional limitations," the ALJ relied on the vocational expert's testimony that someone with Spease's age, education, work experience, and physical limitations could perform jobs like quotation clerk, document preparer, and addresser to conclude that the Commissioner met his burden at Step Five. *Ibid*. Accordingly, the ALJ determined that Spease was not disabled within the meaning of the Social Security Act. *Id*. at 572.

**DISCUSSION**

The Court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); *see also* 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla" and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (*per curiam*). Absent a legal error, the Court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the Court might have ruled differently had it considered the matter in the first instance. *See Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

In urging reversal or remand, Spease argues that the ALJ made several errors in finding that Spease was not disabled, each of which I address in turn.

*Listing 1.04 analysis*

Spease first argues that the ALJ's Step Three analysis was "insufficient and incorrect." He argues that the ALJ did not adequately evaluate Spease's back injuries in concluding that his conditions did not meet or equal the criteria specified in Listing 1.04, which covers disorders of the spine. Doc. #13-1 at 7-12.

At Step Three, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. I,[3] as well as whether the claimant's impairment or combination of impairments lasted for a continuous period of at least 12 months pursuant to 20 C.F.R. § 404.1509 (the "duration requirement"). If so, then the claimant is disabled.

The ALJ considered whether Spease's back injuries met or equaled the requirements of Listing 1.04.[4] The ALJ's Step Three's analysis follows in its entirety:

> The undersigned has evaluated the claimant's severe impairments under the Listings generally, and specifically under the related musculoskeletal listing for Disorders of the Spine, contained in Listing 1.04. The undersigned does not find that the claimant's multi-level degenerative disc disease meets or medically equals Listing 1.04 because the objective medical findings do not provide evidence of nerve root compression, which has resulted in a limitation of the range of motion, motor loss, and accompanied by sensory or reflex deficit.

---

[3] 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

[4] The Listing of Impairments states in relevant part:

> Listing 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);….

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Doc. #11-1 at 567.

Spease challenges the ALJ's conclusion that "the objective medical findings do not provide evidence of nerve root compression, which has resulted in a limitation of the range of motion, motor loss, and accompanied by sensory or reflex deficit." *Ibid*. The parties do not dispute that Spease experienced at least *some* compromise of a nerve root, as is required by Listing 1.04. For example, the parties agree that Spease's October 2011 MRI of his lumbar spine "showed an L5-S1 disc herniation, which clearly impinged on the right L5 nerve root, as well as an L4-L5 disc bulge resulting in mild to moderate canal stenosis and neural foramen stenosis, as well as possible contact with the L5 nerve root in the lateral recess and L4 nerve root in the neural foramen." Docs. #13-2 (¶ 1) (Spease Med. Chron.); #14-2 (¶ 1) (Resp.); *see also* Doc. #11-1 at 491-92.

The parties further agree that Spease's MRI taken on March 14, 2012, likewise indicated that a nerve root could be affected by his injuries. *See* Docs. #13-2 (¶ 9) (Spease Med. Chron.); #14-2 (¶ 9) (Resp.); *see also* Doc. #11-1 at 435-37. Reviewing Spease's MRI at a follow-up visit on March 16, 2012, Dr. Mastroianni noted that Spease's "disc that had been weakened during his original injury, has further progressed and has now ruptured in such a way as to compress the right sided L4 and possibly L5 and S1 nerve roots on that side." Doc. #11-1 at 509. The next month, Dr. Mastroianni noted Spease "has some sensitivity to position with intermittent pain in the leg and I suspect that there is some leftover irritability in that nerve root." *Id*. at 514.

And in July 2012, Spease had another MRI. Doc. #11-1 at 518. Dr. Tischkoff interpreted the results, and noted that at L3-L4, "[p]ostoperative changes compatible right hemilaminotomy are noted with scarring or granulation tissue surrounding the right L3 nerve root neural foramen and right L4 nerve root in the lateral recess. There may be a tiny residual right subarticular disc

protrusion contacting the right L4 nerve root," and "[a]t L4-L5, postoperative changes compatible right hemilaminotomy and foraminotomy are noted with scar or granulation tissue surrounding the right L4 nerve root neural foramen and right L5 nerve root in the lateral recess. Also noted is a left hemilaminotomy with scarring surrounding the left L4 and LS nerve roots in the recess." *Id*. at 518-19.

Yet the record does not conclusively show that any nerve root compression Spease experienced was *also* "accompanied by sensory or reflex deficit" *and* "resulted in a limitation of the range of motion, motor loss," both of which are required criteria in Listing 1.04. For example, Spease's independent medical exam with Associated Neurologists of Southern Connecticut, which was administered by Dr. Jeffrey Gross in December 2011, makes no mention of any nerve root compression (other than noting Dr. Tishkoff's interpretation of Spease's October 2011 MRI). Doc. #11-1 at 353-57. Spease's MRI, taken in March 2012, was interpreted by Dr. Chu as showing only "right-sided neural foraminal stenosis with *potential* contact of the exiting right L3 nerve root," and "moderate bilateral neural foraminal stenosis, worse on the left, *probably* with contact of the exiting L4 nerve roots." *Id*. at 436 (emphasis added). Dr. Chu also noted that the MRI showed "marked perifacet edema with enhancement at L3-L4 and L4-L5. Enhancement is seen along the laminotomy approach at L4-L5 on both sides, with circumferential enhancement around the thecal sac and around the descending [] left L5 nerve root, which *may* represent epidural scarring or fibrosis." *Ibid*. (emphasis added).

Nor does Spease point to anything specific in the record showing that he experienced all the criteria required by Listing 1.04 continuously for a period of at least 12 months. *See* Doc. #13-1 at 7-12; *see also* 20 C.F.R. § 404.1509 (the duration requirement). For example, about a year after Spease's onset of injury, the medical examination in December 2012 by Dr. Gross

showed that Spease "appear[ed] comfortable," and had a "full range of motion" apart from straight leg raising, which Spease "tolerated at 45 degrees on the left and 60 degrees on the right." Doc. #11-1 at 489. Dr. Gross also concluded that Spease's "[m]otor examination reveal[ed] no drift, weakness, tone change or atrophy." *Ibid*. By March 2014, Spease's range of motion for straight leg raising showed more improvement. Dr. Roman, who prepared Spease's Life Care Plan (which is a comprehensive document that describes the medical condition and ongoing medical care requirements of an individual with chronic or permanent health care needs, Doc. #11-1 at 1016), noted that Spease's "straight leg raising is positive on the right at 70 degrees, positive on the left at 90 degrees." *Id*. at 1039.

Any compression of Spease's nerve roots, along with any resulting limitation of the range of motion, motor loss, and sensory or reflex deficit, likewise appears to have changed over time. In May 2013, a MRI taken before his third surgery, which was read by Dr. Mirabelli, showed that there was still some "potential contact of the exiting right L4 nerve root" at L3-L4, but that "the extent of enhancement around the nerve root is less than the prior study, and previously noted enhancement surrounding the exiting right L3 nerve root is no longer present." Doc. #11-1 at 947-48. At the same time, Dr. Mirabelli noted, "[t]here is a new 6 mm left paracentral extrusion extending inferiorly, impinging on the descending left L5 nerve root in the lateral recess" at L4-L5. *Id*. at 948. Following the surgery, Dr. Guaranaccia performed a consultative examination of Spease, and noted that although "[h]e sat stiffly for the interview and walked to the exam table slowly with his cane," Spease "had no muscle weakness." *Id*. at 558-59; *see also* Docs. #13-2 (¶ 27) (Spease Med. Chron.); #14-2 (¶ 27) (Resp.). And at an October 2013 follow-up visit, Dr. Mastroianni noted that Spease underwent transcutaneous nerve stimulators, which

was found to be very helpful and allowed him to be much more active than he would be otherwise. *See* Doc. #11-1 at 1029 (Dr. Roman reviewing Spease's medical history).

Even if Spease did have some nerve root compression from November 6, 2011 to December 31, 2015, and even if nerve root injury at some points *also* resulted in loss of range of motion *and* was accompanied by sensory or reflex deficit, Spease is hard-pressed to argue that the objective evidence in the record conclusively shows he experienced it continuously for the required duration of 12 months.[5] Accordingly, the ALJ's conclusion that Spease's impairments did not fulfill all the specified medical criteria in Listing 1.04 was supported by substantial evidence.

### Weight assigned to medical opinions

Spease next submits that the ALJ did not make proper weight assignments as to the medical opinions, arguing that all of the opinions from treating and examining doctors are entitled to more than "little weight" as well as more weight than the opinions of the state agency reviewers, who reviewed only some of his records. Doc. #13-1 at 12-13; *see also id*. at 12-16. Furthermore, Spease argues that "as a result of diminished weight assignments, and assigning 'great weight' to the state agency doctors in name only, without actually adopting their opinions, the ALJ was left with no reliable opinion evidence." *Id*. at 14. Spease's claim of error on this point amounts to an argument that the ALJ traversed the treating physician rule.[6] The treating physician rule requires that "the opinion of a [plaintiff's] treating physician as to the nature and

---

[5] The ALJ does acknowledge in his decision that "[t]he record contains a gap from 2014 through the date last insured in 2015, while the claimant was incarcerated." Doc. #11-1 at 569.

[6] On March 27, 2017, new regulations took effect that effectively abolish the treating physician rule; for claims filed before March 27, 2017, however, the treating physician rule continues to apply. *See* 20 C.F.R. § 416.927; *Smith v. Comm'r of Soc. Sec. Admin*., 731 F. App'x 28, 30 n.1 (2d Cir. 2018); *Johnson v. Berryhill*, 2019 WL 1430242, at *12 n. 10 (D. Conn. 2019). That is the case here because Spease filed his claim in 2013. *See Smith*, 731 F. App'x at 30 n.1.

severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (quoting 20 C.F.R. § 404.1527(c)(2)); *see also* 20 C.F.R. § 416.927 (regulations for evaluating opinion evidence for claims filed before March 27, 2017). When the treating physician's opinion is not given controlling weight, "the ALJ must explicitly consider" a number of factors to determine the proper weight to assign, including "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (*per curiam*)); *see generally* 20 C.F.R. § 404.927(c). The ALJ then must "give good reasons in [his] notice of determination or decision for the weight [given the] treating source's [medical] opinion." *Estrella,* 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (*per curiam*)). Unless "a searching review of the record" provides assurance that "the substance of the treating physician rule was not traversed," an ALJ's failure to apply these factors leaves the Court unable to conclude the error was harmless and requires remand. *Ibid*. (quoting *Halloran*, 362 F.3d at 32-33).

In his April 2019 decision, the ALJ discussed the opinions of Dr. Gross, Dr. Guaranaccia, and Dr. Mastroianni, as well as the state agency reviewers, Dr. Coughlin and Dr. Lorenzo. Doc. #11-1 at 568-70. Spease's treating physician appears to be Dr. Mastroianni, although neither the ALJ nor Spease expressly refers to him as such, *see id*. at 618, and Dr. Gross appears to be Spease's treating neurologist, *id*. at 619. So the question here is whether the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily

than the opinions of Spease's treating physician and treating neurologist. *Estrella*, 925 F.3d at 96; *see also Didio v. Berryhill*, 2019 WL 1352807, at *5 (D. Conn. 2019).

In concluding that Spease could do sedentary work, the ALJ gave "great weight" to the opinions by the state agency reviewers that reached the same conclusion. Doc. #11-1 at 56869. But the ALJ did not afford the same weight to the state agency reviewers' opinion that Spease could engage in light work that entailed lifting and carrying based on other evidence in the record—namely, Spease's need for and adoption of the use of a cane, which the state reviewers also added. In other words, the ALJ's decision to afford great weight to the state reviewers' conclusion that Spease could engage in sedentary work was more "consistent" with the entire record than the state reviewers' opinion that Spease could engage in light work.

The ALJ assigned "little weight" to Dr. Mastroianni's February 2013 opinion that Spease could not work at all. Id. at 569-70. The ALJ first explained that this was because Dr. Mastroianni's opinion was rendered shortly before Spease's third surgery and that there was no indication that this was a permanent restriction. *Id*. at 569. But perhaps most importantly, the ALJ explained that he assigned little weight to Dr. Mastroianni's opinion that Spease was "permanently disabled" or "unable to work" because such conclusions were not medical opinions. *Ibid*. Rather, the ALJ explained that such conclusions are administrative findings dispositive of a case, and as such, are reserved for determination only by the Commissioner pursuant to 20 C.F.R. §§ 404.1527(d), 416.927(d). *Ibid*.

For the same reason, the ALJ assigned "little weight" to Dr. Gross's December 2012 opinion that Spease had a "significant degree of permanent disability" to the lumbar spine. *Id*. at 570. Furthermore, in assigning "little weight" to Dr. Gross's December 2012 opinion, the ALJ

noted that Dr. Gross examined Spease's injuries in the worker's compensation context, which has "different standards for assessing disability." *Ibid*.

Spease offers no authority showing that the ALJ was wrong to give little or no weight to certain opinions by Dr. Mastroianni and Dr. Gross about issues that are reserved to the Commissioner. The regulations applicable to claims filed before March 27, 2017, provide that opinions on certain issues, including RFC and whether a claimant is "disabled" or "unable to work," 20 C.F.R. § 416.927(d)(1)-(2), are not "medical opinions" because they constitute "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability," § 404.927(d). Accordingly, the ALJ was entitled not to "give any special significance to the source of an opinion on issues reserved to the Commissioner." § 404.927(d)(3).[7]

All in all, the ALJ sufficiently provided "good reasons" for weighing the opinions of the consultative physicians more heavily than the opinions of Spease's treating physician and treating neurologist.

### RFC assessment

Spease next argues that the ALJ did not make a complete RFC assessment. Doc. #13-1 at 16-17. The ALJ wrote that Spease has:

> the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally bend, balance, twist, squat, kneel, crawl, climb, but no climbing of ladders, ropes, or scaffolds. He must avoid hazards, such as heights, vibration, and dangerous machinery. Driving is okay. He needs an

---

[7] As a final matter on this claim of error, Spease argues that the ALJ had a duty to solicit additional evidence, arguing that "if the ALJ needed further clarification of vague or unclear opinions, he had a duty to develop the record by obtaining clarification where necessary." Doc. #13-1 at 13. But the Commissioner points out that "at his latest hearing Spease's attorney represented to the ALJ that, apart from records from Plaintiff's incarceration (which were subsequently submitted, Tr. 1052) there was no other outstanding evidence." Doc. #14-1 at 12. Absent any showing from Spease that he was coerced or deceived by his attorney, *see Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010), this objection is unavailing.

> environment free from concentrated cold and heat. He requires a
> cane for ambulation only.

Doc. #11-1 at 567.

In arguing that the ALJ's RFC assessment is incomplete, Spease does not elaborate on what, specifically, is lacking from the ALJ's analysis. *See* Doc. #13-1 at 16-17. But Spease appears to take issue mainly with the ALJ's conclusion that Spease could perform any sedentary work, citing Dr. Guaranaccia's August 2013 note that Spease was limited to sitting for 10 to 15 minutes at a time and pointing to Spease's own testimony about his inability to sit for more than 20 minutes at a time. *See ibid*.

As an initial matter, insofar as Spease would claim that the ALJ did not adequately credit his own testimony about his inability to sit, the ALJ is entitled to conclude that the persuasive value of such subjective testimony is limited. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.") (citations omitted).

The ALJ's RFC assessment for Spease is supported by substantial evidence. Specifically, the ALJ found persuasive the opinions by Dr. Coughlin and Dr. Lorenzo, the state agency reviewers, which support the ALJ's RFC finding that Spease could only do sedentary work (even if their opinions also concluded that Spease could do some light work). As the ALJ wrote,

> The State agency limited the claimant to lifting and carrying
> consistent with light work, but standing and walking of 4 hours,
> consistent with sedentary work (Exhibit 4A). They also added in the
> need for a cane for prolonged ambulation. The undersigned has
> given great weight to their overall assessment of sedentary, but finds
> that a light residual capacity for lifting and carrying is too much,

> even though the claimant did testify that he could lift 17 pounds. The
> undersigned has adopted the use of a cane for ambulation.

Doc. #11-1 at 569. Accordingly, Spease's claim of error on this point—that the ALJ's RFC

assessment was incomplete—falls short.

### *Borderline age status*

Lastly, Spease argues that the ALJ erred by not applying the borderline age rules, which

he submits would have required the ALJ to evaluate his claim under the Medical Vocational

Guidelines (the "Grids") 201.14, which in turn would have "dictate[ed] a finding of disability" in

Spease's case. Doc. #13-1 at 17-18.

At Step Five of the disability analysis, the Commissioner bears the burden of showing

that the claimant can perform work that exists in significant numbers in the national economy.

*See Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999). Ordinarily, the Commissioner may

satisfy his burden of proof at Step Five by resorting to the applicable Grids, which consist of

charts that indicate whether a claimant is disabled based on his or her age, education, RFC, and

work experience. *See id*. at 78-79; 20 C.F.R. Pt. 404, Subpt. P, App. 2. However, if the Grids fail

to describe the full extent of a claimant's limitations (such as when "the claimant's exertional

impairments are compounded by significant nonexertional impairments"), then "the

Commissioner must introduce the testimony of a vocational expert (or other similar evidence)

that jobs exist in the economy which [the] claimant can obtain and perform." *Rosa*, 168 F.3d at

78 (internal quotation marks omitted).

Here, at Step Five the ALJ simply noted that Spease was 49 years old on the date of last

insured. Doc. #11-1 at 570 (citing 20 C.F.R. § 404.1563). The ALJ then relied on the testimony

of a vocational expert in Step Five about the number of sedentary jobs (with the additional

limitations required by Spease's condition) in the national economy to reach the decision that Spease was not disabled. *Id*. at 571-72.

The Grids divide claimants into three age categories: "younger person" (under age 50); "person closely approaching advanced age" (age 50 to 54); and "person of advanced age" (age 55 or older). 20 C.F.R. § 404.1563(c)-(e). Based on his chronological age, Spease would fall under the "younger person" age category. But the Social Security regulations also provide that these age categories should not be applied "mechanically" in so-called borderline age situations. 20 C.F.R. § 404.1563(b). A borderline age situation exists when (1) the claimant is "within a few days to a few months of reaching an older age category," and (2) "using the older age category would result in a determination or decision that [the claimant] [is] disabled[.]" *Ibid*.; *see also Johnson*, 2019 WL 1430242, at *12 (citing the two-part borderline age test, as explained by section I-2-2-42(B) of the SSA's Hearings, Appeals and Litigation Law Manual ["HALLEX"]); *Goncalves*, 2018 WL 6061570, at *4 (same).

In such borderline age situations, the ALJ must decide whether it is more appropriate to use the older age category rather than the claimant's chronological age in order to determine the claimant's disability status. *See* 20 C.F.R. § 404.1563(b); *see also Goncalves*, 2018 WL 6061570, at *3 (citing HALLEX I-2-2-42(B)). When deciding which age category to use, ALJs are directed to take a "sliding scale" approach that considers "the overall impact of all the factors on the claimant's ability to adjust to doing other work (*e.g.*, residual functional capacity combined with age, education and work experience....)." *Goncalves*, 2018 WL 6061570, at *3 (quoting HALLEX I-2-2-42(C)); *see also* 20 C.F.R. § 404.1563(b) ("[W]e will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.").

Nevertheless, even though the ALJ's application of Spease's chronological age resulted in a decision that he was not disabled, the ALJ did not identify whether Spease's claim might involve a borderline age situation. *See Goncalves*, 2018 WL 6061570, at *3 ("If application of a claimant's chronological age results in a decision that the claimant is not disabled, an ALJ will identify whether the claim may involve a borderline age situation by applying a two-part test[.]") (quoting HALLEX I-2-2-42(B)). In fact, the ALJ did not even consider whether Spease's age prompted an inquiry into whether a borderline age situation existed, let alone apply the two-part borderline age test and then make a determination as to whether it would be more "appropriate to use the claimant's chronological age or the higher age category." *Johnson*, 2019 WL 1430242, at *12 (quoting HALLEX I-2-2-42(B)).

Spease's case plainly gave rise to the question of whether he was "within a few days to a few months of reaching an older age category." 20 C.F.R. § 404.1563(b). Born on May 25, 1966, Spease was 49 years, seven months, and seven days old on December 31, 2015, the date Spease was last insured for benefits. In other words, Spease was slightly less than five months away from being 50 years of age on the relevant date. And in response to questioning from the Court at oral argument, counsel for Spease represented that the borderline age issue was raised before the ALJ. *See also* Doc. #11-1 at 834 (pre-hearing representative brief dated January 23, 2019).

The Social Security regulations do not specify an exact, numerical threshold for when a claimant's age becomes borderline. *See Goncalves*, 2018 WL 6061570, at *4 ("SSA does not have a precise programmatic definition for the phrase 'within a few days to a few months.'") (quoting HALLEX I-2-2-42(B)(1)). "This lack of clarity is intentional because, as the SSA itself has explained, fixed guidelines as to when a borderline situation exists ... would themselves reflect a mechanical approach to determining the effect of age on a person's ability to perform

work available in the national economy." *Goncalves*, 2018 WL 6061570, at *4 (internal

quotations omitted).

However, the SSA has elaborated on its approach to borderline age cases through

guidance published in HALLEX and its Program Operations Manual System ("POMS"). *Ibid*. In

these documents, the SSA notes that "[t]he word 'few' should be defined using its ordinary

meaning, e.g., a small number[,]" and that the Commissioner generally "considers a few days to

a few months to mean a period not to exceed six months." *Ibid*. (quoting HALLEX I-2-2-

42(B)(1) and POMS DI 25015.006(B)). Consistent with the agency's approach, several courts in

this Circuit have concluded that less than five months generally suffices to render a claimant's

age borderline. *See, e.g.*, *Goncalves*, 2018 WL 6061570, at *4 (concluding "[i]n light of the

SSA's guidance, the weight of the case law in the Second Circuit, and the fact that Goncalves

was less than five months from becoming 'a person of advanced age,'" that the claimant

Goncalves "fell within the outer limits of a borderline age situation."); *Hollinsworth v. Colvin*,

2016 WL 5844298, at *5 (W.D.N.Y. 2016) (collecting cases in which courts have held that a

period of up to six months was borderline); *Torres v. Comm'r of Soc. Sec.*, 2015 WL 5444888, at

*10 (W.D.N.Y. 2015) (same); *Metaxotos v. Barnhart*, 2005 WL 2899851, at *7-8 (S.D.N.Y.

2005) (finding that six months and fourteen days away from a higher age category was

borderline).

In light of the SSA's guidance and the fact that Spease was less than five months from

falling in the "closely approaching advanced age" category on the date last insured, it is plain

that Spease fell within at least the outer limits of a borderline age situation. *See Goncalves*, 2018

WL 6061570, at *4 (concluding the same). The ALJ therefore erred by mechanically applying

Spease's chronological age without discussing whether it would be appropriate to move Spease

into the older age category. *See Schofield v. Saul*, 950 F.3d 315, 320-21 (5th Cir. 2020)

(discussing holding of multiple federal courts of appeals requiring that ALJ consider borderline

age); *see also Goncalves*, 2018 WL 6061570, at *4 (same); *Waldvogel v. Comm'r of Soc. Sec.*,

2017 WL 3995590, at *12 (N.D.N.Y. 2017) (same).

       Indeed, given Spease's age on the date of last insured, the record of this case raises

serious doubts as to whether the ALJ was even aware of the possibility that Spease's age was

borderline, even though "[SSA] regulations place the burden on the ALJ to recognize whether a

claimant is approaching an age that would qualify him or her for a higher age category[.]"

*Paskins v. Colvin*, 2016 WL 8711441, at *15 (E.D.N.Y. 2016); *see also* HALLEX I-2-2-42(B)

("If application of a claimant's chronological age results in a decision that the claimant is not

disabled, an ALJ will identify whether the claim may involve a borderline age situation by

applying a two-part test[.]").

       If the ALJ had classified Spease as a "person closely approaching advanced age," instead

of as a "younger person," there is sufficient evidence to suggest that the Grids would have

directed a finding of "disabled" for Spease, which is the second part of the borderline age test.

*See Waldvogel*, 2017 WL 3995590, at *12-14. As noted above, the next higher age category for

Spease would be 50-54, which is "closely approaching advanced age." *See* 20 C.F.R. Pt. 404,

Subpt. P, App. 2, § 201.00(g); 20 C.F.R. § 404.1563(d). And the Grids direct a finding of

disability for a person (1) with a maximum RFC limiting him to sedentary work; (2) is "closely

approaching advanced age"; (3) has at least a high school degree; and (4) has skills that are not

transferable. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.14.

       Had Spease been classified as a person "closely approaching advanced age," the record

indicates that Spease would likely fulfill the other three criteria of section 201.14 of the Grids.

Case 3:19-cv-01199-JAM   Document 21   Filed 07/01/20   Page 20 of 22


Here, the ALJ concluded that Spease "had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can occasionally bend, balance, twist, squat, kneel, crawl, climb, but no climbing of ladders, ropes, or scaffolds." Doc. #11-1 at 567. The ALJ also noted that Spease had at least a high school education. *Id*. at 570. Finally, the ALJ noted that Spease's past relevant work was skilled but that he was unable to perform any past relevant work. *Ibid*. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability…." *Id*. at 571. At the hearing, however, the vocational expert testified that Spease did not have transferable skills, stating "My opinion is those skills are industry specific and would not readily transfer. No transferrable skills, Your Honor." Doc. #11-1 at 600. So, if the ALJ had used the next oldest age category rather than Spease's chronological age, there is at least a significant likelihood that the ALJ would have determined that Spease was disabled under the Grids. *See Schofield*, 950 F.3d at 321-22 (rejecting argument that ALJ's failure to consider potential application of borderline age rule was harmless error).

All in all, the ALJ here failed to recognize that Spease was within five months of a higher age classification. At a minimum, this circumstance obligated the ALJ to progress to the second requirement of the two-part test and determine whether using the higher age category, namely, the "closely approaching advanced age" category, would result in a decision of disabled. *See Paskins v. Colvin*, 2016 WL 8711441, at *17 (E.D.N.Y. 2016). But here the ALJ gave no indication that he was even aware of a borderline age situation in Spease's case, which was raised in Spease's pre-hearing submission. Nor did the ALJ provide a rationale for why he decided to use Spease's chronological age instead of the older age category under the circumstances in the Step Five analysis. In sum, the ALJ's decision to mechanically apply Spease's chronological age without discussing whether it would be appropriate to move Spease

into the older age category is not supported by substantial evidence. *See Goncalves*, 2018 WL 6061570, at *4; *cf. Jerome v. Astrue*, 2009 WL 3757012, at *12 (D. Vt. 2009) (in evaluating a claim for supplemental security income benefits, finding that the ALJ erred because, while he noted the claimant's age on the alleged disability onset date, he failed to mention or evaluate the fact that the claimant's age was borderline on the date of the ALJ's decision).

In light of the ALJ's failure to consider whether a borderline age situation existed in Spease's case, remand is appropriate. *See, e.g., Goncalves,* 2018 WL 6061570, at *6 (concluding the same and remanding to the ALJ for proper consideration of claimant's borderline age situation); *Johnson*, 2019 WL 1430242, at *12 (remanding for the ALJ to consider whether a borderline age situation existed in the first instance); *Amato v. Berryhill*, 2019 WL 4175049, at *5 (S.D.N.Y. 2019) (remanding because "[g]iven the fact that ALJ explicitly failed to consider Amato's borderline age situation, this Court cannot complete this review without some showing as to the Commissioner's consideration of applying the higher age category, which she indisputably is required to do."). I will thus remand this case to the ALJ to consider whether a borderline age situation exists and, if so, to determine under the circumstances of his case whether to use Spease's chronological age or to evaluate him using the next higher age category.

## CONCLUSION

For the reasons discussed above, the Commissioner's motion to affirm, Doc. #14, is DENIED, and Spease's motion to reverse, Doc. #13, is GRANTED. The Clerk of the Court is directed to REMAND this case to the Commissioner for further proceedings in accordance with

this decision. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 1st day of July 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge